# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: January 7, 2021

* * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| MARIA SWICKI, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 17-1377V |
| v. | * | |
| | * | Special Master Nora Beth Dorsey |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | Finding of Fact; Onset; Influenza ("Flu") |
| | * | Vaccine; Shoulder Injury Related to Vaccine |
| Respondent. | * | Administration ("SIRVA"). |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

Sylvia Chin-Caplan, Law Office of Sylvia Chin-Caplan, Boston, MA, for petitioner.
Traci R. Patton, U.S. Department of Justice, Washington, DC, for respondent.

## FACT RULING ON ONSET[1]

On September 28, 2017, Maria Swicki ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq.,[2] (the "Vaccine Act" or "Program"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccination she received on October 3, 2014. Petition at Preamble (ECF No. 1).

Prompting this fact ruling was a question as to the issue of onset of petitioner's shoulder pain. Petitioner's medical records do not document complains of shoulder pain until months after vaccination. Specifically, petitioner visited an orthopedist in June 2015 to evaluate left

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

shoulder pain that she reported began two months prior, or in April 2015—six months after the October 3, 2014 flu vaccination at issue.  See Petitioner's Exhibit ("Pet. Ex.") 11 at 12; Order dated Feb. 6, 2019, at 1 (ECF No. 36).  The parties were afforded the opportunity to brief the issue of onset and subsequently a fact hearing was held on October 22, 2020.

After a review of the record as a whole, a fact hearing, and for the reasons set forth below, the undersigned finds by preponderant evidence that the onset of petitioner's shoulder pain began in April 2015, approximately six months after the administration of her flu vaccine on October 3, 2014.

## I.    PROCEDURAL HISTORY

On September 28, 2017, petitioner filed a petition that was assigned to the Special Processing Unit ("SPU").  Petition (ECF No. 1); SPU Initial Order dated Sept. 29, 2017 (ECF No. 5).  Petitioner filed medical records and affidavits from November 2017 to June 2018.  Pet. Exs. 1-31.  On November 30, 2018, respondent filed his Rule 4(c) Report, finding "this case is not appropriate for compensation under the terms of the Vaccine Act."  Respondent's Report ("Resp. Rept.") at 2 (ECF No. 32).

On December 12, 2018, this case was removed from SPU.  Order Reassigning Case dated Dec. 12, 2018 (ECF No. 33).  Petitioner filed an affidavit in January 2019.  Pet. Ex. 32.  A status conference was held, and the parties were ordered to file briefs on the issue of onset.  Petitioner filed her brief on April 8, 2019, and respondent filed his brief on April 29, 2019.  Pet. Brief Regarding the Onset of Her Shoulder Injury ("Pet. Br."), filed Apr. 8, 2019 (ECF No. 38); Resp. Br. Regarding Onset of Pet. Alleged Shoulder Injury ("Resp. Br."), filed Apr. 26, 2019 (ECF No. 40).

This case was reassigned to the undersigned in October 2019.  Notice of Reassignment dated Oct. 8, 2019 (ECF No. 45).  Expert reports were filed from both parties.  Pet. Ex. 33; Resp. Ex. A.  Thereafter, the undersigned held a status conference during which she recommended holding an onset hearing.  Order dated Aug. 26, 2020 (ECF No. 67).

An onset hearing was held on October 22, 2020.  Petitioner and Pam Benoit testified.  Transcript ("Tr.") 3.  Petitioner initially identified her husband, William Swicki, as a witness.  Joint Status Rept., filed Sept. 9, 2020, at 1 (ECF No. 68).  Prior to the hearing, petitioner notified the Court that she would no longer be calling her husband as a witness.  Pet. Status Rept., filed Oct. 5, 2020 (ECF No. 72).

This matter is now ripe for adjudication.

## II.    FACTUAL HISTORY

### A.    Summary of Medical Records Related to Onset[3]

On October 3, 2014, petitioner received a flu vaccine in her left deltoid.  Pet. Ex. 1 at 1; Pet. Ex. 8 at 34.  Prior to the vaccination at issue, petitioner had a number of prior medical conditions, including congenital heart disease, hypothyroidism, Ehlers-Danlos syndrome ("EDS"), pelvic organ prolapse, incontinence, and issues with lower back, hip, and thigh pain. Pet. Br. at 1.

Before her vaccination, in August 2014, petitioner began seeing chiropractor Christopher Caliri, D.C. for lower back, right hip, right buttock, and right leg pain.  Pet. Ex. 7 at 7.  After vaccination, petitioner saw Dr. Caliri eight times in October 2014, four times in November 2014, and two times in December 2014.  Id. at 11-13.  None of these visits document complaints of left shoulder pain.

Petitioner had a follow-up examination with her cardiologist, Joseph Wylie, D.O., on October 9, 2014.  Pet. Ex. 28 at 40-41, 65.  No shoulder complaints were documented.

On February 3, 2015, petitioner had a follow-up visit with her endocrinologist.  Pet. Ex. 2 at 6-7.  Petitioner visited Concentra Urgent Care Center for a cough on February 17, 2015.  Pet. Ex. 12 at 1-5.  Petitioner also saw her primary care physician on February 24, 2015.  Pet. Ex. 8 at 37-39.  No shoulder complaints were noted during these visits.

On June 11, 2015, petitioner visited Dr. Stephanie Favreau, a primary care physician, for a new patient visit.  Pet. Ex. 11 at 11-14.  Petitioner complained of limited range of motion in her left shoulder for two months.  Id. at 11.

Petitioner saw orthopedist, Dr. Andrew Green, on June 16, 2015 for left shoulder pain. Pet. Ex. 10 at 8.  Dr. Green documented "development of atraumatic superolateral shoulder pain with radiation along the lateral aspect of the arm, present for about two months now."  Id.  The pain is intermittent and "[a]ggravated by abduction, elevation, [and] resistive activities."  Id.  He noted that petitioner "thinks she had a similar pain, though does not recall her exact diagnosis" several years ago,[4] and believes a cortisone injection helped.  Id.  Motrin and topical anti-inflammatories were not helping petitioner's shoulder pain.  Id.  Dr. Green diagnosed petitioner with left shoulder rotator cuff syndrome.  Id.  He recommended physical therapy ("PT") and a follow up in two months.  Id.

---

[3] The undersigned has reviewed all of the petitioner's medical records, but only summarizes those pertinent to onset.  For a more thorough summary of the records, see Resp. Rept. at 2-5; Pet. Br. at 1-14; and Resp. Br. at 1-5.

[4] At the hearing, petitioner testified that this incident was in 2006 and she could not recall which shoulder was affected.  Tr. 27-28, 53, 63.  Unlike the shoulder pain at issue here, this pain "was more of a dull pain, ache" that "went away within two, three days."  Tr. 29.

Petitioner had her initial PT evaluation on June 18, 2015.  Pet. Ex. 14 at 2.  Petitioner's onset was noted as two months earlier.  Id.

On August 11, 2015, petitioner followed up with Dr. Green.  Pet. Ex. 10 at 6.  Petitioner reported that she felt the same as she did during her last visit.  Id.  Dr. Green administered a cortisone injection.  Id.  He recommended petitioner continue to perform her at home exercises, use her arm for light daily activity, and follow up in six weeks.  Id.

Dr. Caliri treated petitioner 16 times in 2015.  Pet. Ex. 7 at 13-14, 19-20.  Petitioner's complaints of left shoulder pain are first documented by Dr. Caliri during her eleventh visit on August 24, 2015.  Id. at 19; Pet. Ex. 29 at 100.

Petitioner had a follow-up examination with Dr. Green on September 22, 2015.  Pet. Ex. 10 at 4.  Dr. Green noted the cortisone injection "was not very helpful," and the home exercises have not improved petitioner's shoulder symptoms.  Id.  He added that petitioner has "[n]o worsened severity than it was in the past, but also no improvement."  Id.  An MRI was recommended.  Id.

Petitioner underwent an MRI of her left shoulder on October 22, 2015.  Pet. Ex. 7 at 24.  The history indicated petitioner had "[l]eft shoulder pain radiating to the arm for one year with no injury."  Id.  The impression was "[h]eterogeneous signal within the superior labrum that extends to involve the adjacent portions of the anterior superior labrum and posterior labrum which is suggestive of a SLAP tear" and "[m]ild tendinopathy of the supraspinatus and subscapularis tendon."  Id.  Dr. Green shared these results with petitioner on October 28, 2015, and recommended petitioner schedule a follow-up appointment and continue with light stretching exercises.  Pet. Ex. 10 at 3.

Petitioner saw Dr. Green on December 1, 2015.  Pet. Ex. 10 at 1.  Dr. Green wrote petitioner "has had pain for greater than one year.  There is no injury at the onset."  Id.  He assessed petitioner with persistent left rotator cuff syndrome, bursitis, and possibly impingement.  Id.

On January 20, 2016, petitioner began PT again for her left shoulder.  Pet. Ex. 21 at 17, 19-20.  During the initial evaluation, petitioner reported "chronic [left] shoulder pain since 12/2014, worsening over time" and no trauma or falls.  Id. at 20.

On April 13, 2016, petitioner had a neurology consultation with Dr. Keith R. Brecher for left shoulder and right hip pain.  Pet. Ex. 3 at 5-6.  Dr. Brecher wrote, "[petitioner] developed shoulder pain after a flu shot one year ago.  She thinks she may have had [too] high an injection.  The shoulder pain is constant.  Id. at 5.  He noted his "[e]xam show[ed] restricted mobility at the left shoulder with an MRI showing a possible SLAP tear and tendinosis," which he found "may account for the shoulder pain, though patient has had pain radiating to the neck and down the arm toward the hand raising the possibility of a cervical [radiculopathy] or thoracic outlet syndrome."  Id. at 6.  Dr. Brecher ordered an electromyography ("EMG")/nerve conduction study ("NCS") of the left arm.  Id.

On April 20, 2016, petitioner visited Dr. Favreau.  Pet. Ex. 11 at 1-4.  Dr. Favreau noted petitioner "has been doing research" and questioned whether her shoulder pain was "flu related." Id. at 1.

The EMG/NCV testing conducted on April 22, 2016 was abnormal for "depressed median and ulnar motor responses," which were noted as non-specific findings.  Pet. Ex. 3 at 3. No active denervation was noted.  Id.

On February 3, 2017, petitioner presented to rheumatologist, Dr. John M. Conte.  Pet. Ex. 16 at 10-16.  Under history of present illness, Dr. Conte documented, "[t]wo years ago received a flu shot to left deltoid.  Since then has had difficulty with full active [range of motion] of the shoulder.  Was quite painful as well."  Id. at 11.

### B.    Affidavits and Hearing Testimony

#### 1.    Petitioner's Affidavit and Hearing Testimony

Prior to vaccination, petitioner was very active.  Pet. Ex. 26 at ¶ 5.  Petitioner enjoyed hiking, yoga, and Pilates.  Id.  She never experienced any shoulder problems from working out. Id.; Tr. 10.  Petitioner's daily routine consisted of household chores, laundry, dishes, cooking, cleaning, yard work, and taking care of her son.  Tr. 8.  She also volunteered at her son's school and with Boy Scouts, and took her son to a dyslexia center twice a week during the 2014-2015 school year.  Tr. 9-10, 41.

On October 3, 2014, she received a flu vaccine in her left shoulder.  Pet. Ex. 26 at ¶ 6; Tr. 11.  Before vaccination, she had no issues with her left shoulder.  Tr. 11-12.  She never experienced any dislocation of either shoulder.  Tr. 60.  Other than one shoulder issue in 2006, petitioner never experienced any other issue with either shoulder.  Tr. 63.

The day following vaccination, petitioner "began experiencing throbbing and aching pain in [her] left shoulder.  Certain movements, in particular, such as picking [her] left arm over [her] head or moving it behind [her], would cause sharp and stabbing pain."  Pet. Ex. 26 at ¶ 7; see also Tr. 12.  She had limited range of motion when she "moved [her] arm up over [her] head, to [her] side, or behind [her] back."  Pet. Ex. 26 at ¶ 8.  She testified that she was unable to comfortably raise her left arm above her shoulder.  Tr. 12.

During cross-examination, petitioner testified that within one day after her flu vaccination, she began experiencing pain with movement and reduced range of motion.  Tr. 50. She also had difficulty doing everyday tasks, such as carrying the laundry basket, folding clothes, using the bathroom by herself, dressing, and driving.  Id.

Shortly after vaccination, petitioner discussed her shoulder problems with her husband and mother.  Tr. 13.  Petitioner recalled telling her husband "the flu shot 'did a number on [her] shoulder'" about one week after vaccination.  Pet. Ex. 26 at ¶ 8; see also Tr. 13-14.  Around the same time, she complained to her mother that her shoulder "was still sore" and painful.  Tr. 13.

After two weeks of pain, she thought she "slept on [her] left shoulder the wrong way."  Pet. Ex. 26 at ¶ 8; see also Tr. 14.  She explained that she "had no idea that a flu shot could do this."  Pet. Ex. 26 at ¶ 8.

Petitioner opted to take her mother's advice and iced and relaxed her shoulder, "hoping that eventually the pain would go away."  Tr. 14.  Petitioner's pain was so bad at times that "[she] would just sit with a pillow under [her] arm holding [her] elbow so that [she] would not move it."  Pet. Ex. 26 at ¶ 13.  She had difficulty sleeping, driving a car, using the bathroom, and doing basic household chores.  Id.; Tr. 15, 19-20.  Petitioner continued going to the gym.  Tr. 60-61.  She stopped doing Pilates, but continued Yoga "cautiously."  Pet. Ex. 26 at ¶ 13; see also Tr. 61.  She took Motrin for the pain.  Id. at ¶ 14.  She explained that her shoulder "improv[ed] a little bit."  Tr. 14.  "[T]he pain became more tolerable and less sharp because [she] was using [her] left arm less often."  Pet. Ex. 26 at ¶ 14.  Petitioner testified that her range of motion was improving, and although there was still pain in her shoulder, it was subsiding.  Tr. 15.  However, the pain "never went away completely" and her shoulder never returned to normal.  Pet. Ex. 26 at ¶ 14; see also Tr. 15.

In the Fall of 2014, petitioner volunteered at her son's school store on a weekly basis.  Pet. Ex. 26 at ¶ 9; Tr. 16-17.  Before her flu vaccine, she had no issues setting up the school store; however, after vaccination, she "had to do the bare minimum because [her] left shoulder hurt and [her] range of motion was limited.  [She] could no longer lift the folding table."  Pet. Ex. 26 at ¶ 9.

On October 24, 2014, she volunteered at the school's "Boo Bash."  Pet. Ex. 26 at ¶ 10; Tr. 17.  Petitioner explained that "[d]uring set up, [she] could only assist with small items" and "was unable to help with hanging decorations up" because of her shoulder pain and inability to raise her arm over her head.  Pet. Ex. 26 at ¶ 10; see also Tr. 17.  Additionally, during a volunteer event at her son's school on December 4, 2014, petitioner could not lift baskets filled with items because of her shoulder pain.  Pet. Ex. 26 at ¶ 11; Tr. 18.

During the Christmas holiday in 2014, petitioner also had difficulty setting up her family's Christmas tree, hanging decorations, and wrapping gifts.  Pet. Ex. 26 at ¶ 12.  She testified that her family's Christmas tree and decorations are underneath the steps downstairs, and her husband had to grab all of the Christmas stuff because she "couldn't even carry the boxes with ornaments in it."  Tr. 21.

In March 2015, petitioner's son's school had a Scholastic Book Fair.  Tr. 18-19.  Petitioner explained that some books came in boxes, which she could not lift because of their weight.  Tr. 19.  She was also unable to set up tables and put books on the tables due to her shoulder.  Id.

Around May 16, 2015, during a Boy Scout event, petitioner picked up a nerf football with her left hand and gently tossed it underhand.  Pet. Ex. 26 at ¶ 15; Tr. 22-23.  She immediately felt

pain in her left shoulder.  Pet. Ex. 26 at ¶ 15.  Petitioner described the pain as "throbbing, aching, [and] stabbing."  Tr. 24.  After this event, petitioner opted to see Dr. Green for her left shoulder pain.  Id.; Pet. Ex. 26 at ¶ 16.

At her initial visit with Dr. Green, petitioner explained that "[she] did indicate that [her] shoulder had been hurting for [two] months" because her shoulder started to feel better with rest after the flu shot.  Pet. Ex. 26 at ¶ 17.  However, "the pain flared up again" after the May 2015 Boy Scouts event, which she incorrectly noted was two months prior.  Id.  When speaking with a physician assistant at Dr. Green's office, petitioner explained "that [her] shoulder actually started having issues after a flu shot," but the physician assistant gave petitioner "a look like [she] was crazy."  Id.; see also Tr. 30.

Dr. Green prescribed PT, which did not resolve petitioner's symptoms.  Tr. 34-35.  Petitioner then received a cortisone injection at Dr. Green's office, but that also did not help relieve petitioner's shoulder pain.  Tr. 35.  Dr. Green also discussed surgery with petitioner.  Id.  However, petitioner testified that she decided to not have surgery on her shoulder "[b]ecause there was no definite of what was going on with [her] shoulder. . . .  [She] did not want to be cut open in [her] arm for something that possibly could be there."  Tr. 35-36.

Petitioner testified that by the end of 2015, her shoulder was slowly getting better, although not completely better, with self-care.  Tr. 36.  Petitioner recalled slipping on ice in late December 2015 or early January 2016, and although she avoided falling on the ground, she "jerk[ed] [her] body to catch [her] balance" and subsequently "felt horrendous pain in [her] shoulder."  Pet. Ex. 26 at ¶ 19; see also Tr. 36-37.  The pain "felt like someone ripped [her] arm out of its socket" and was similar to the flare-up in March 2015 at the Boy Scouts event.  Pet. Ex. 26 at ¶ 19; see also Tr. 37.  Her left shoulder pain returned to how it felt after vaccination.  Pet. Ex. 26 at ¶ 19.  Petitioner testified that the pain was stabbing, she had poor range of motion, and she was unable to move it.  Tr. 37.

After this event, petitioner opted to seek further medical care for her left shoulder at Warwick Avenue Therapy, where she was already being seen for hip issues.  Tr. 37.  She also consulted a neurologist in 2016 because she read online that nerve damage could possibly be the reason for her shoulder pain.  Tr. 38. On cross, petitioner explained that she conducted a search on her computer to determine why her shoulder would "hurt so many months after a flu shot."  Tr. 56.  Afterwards, she asked Dr. Favreau on April 20, 2015 whether her shoulder pain could be related to the flu vaccine.  Id.

Petitioner testified that after the flu vaccine and prior to seeking medical care for her left shoulder, she had multiple doctor's visits.  Tr. 42.  She explained that during her visit with her cardiologist, Dr. Wylie, she did not report her left shoulder symptoms "[b]ecause he's a cardiologist.  If [she] was having trouble with chest pain, trouble breathing, shortness of breath, that [she] would tell him."  Tr. 42-43.  Likewise, she did not report her left shoulder symptoms to her endocrinologist because she "see[s] him for thyroid issues. . . .  [I]f [she] was gaining weight

for no reason, losing weight for no reason, and things like that, [she] would tell him those issues, but not with the shoulder." Tr. 43.  Petitioner also saw her chiropractor during this period, who was treating her for her back and hip issues.  Id.  She did not inform her chiropractor of her shoulder pain because she "just figured he was just more of the spine doctor."  Tr. 44.

During an urgent care visit in February 2015, petitioner was diagnosed with bronchitis. Tr. 44.  She testified that no inquiry about her musculoskeletal issues was made during this visit. Tr. 45.  Petitioner followed up with her primary care physician for her bronchitis, and testified that no inquiry about musculoskeletal issues was made at that visit.  Id.  During cross-examination, petitioner testified that at her primary care visit in February 2015, although she was focused on her bronchitis, she also complained about a sweating issue.  Tr. 51-52.

As of April 24, 2018, the date in which her affidavit was executed, petitioner's "left shoulder ha[d] improved," but she continue[d] to have aches and reduced range of motion.  Pet. Ex. 26 at ¶ 21.  During the fact hearing, petitioner testified that her shoulder felt good and she had no symptoms.  Tr. 38-39.

### 2.   Affidavit and Hearing Testimony of Pam Benoit

Pam Benoit provided an affidavit and testified at the fact hearing.  Pet. Ex. 30; Tr. 3.  Ms. Benoit first met petitioner in 2011 when their children were in third grade.  Tr. 66.  They have volunteered together at their children's school, helping with events including "car washes, holiday events, dances, book fairs, [] music recitals, school store, [] teacher appreciation day, [and] teacher breakfast."  Tr. 68.  They were also in the Parent Teacher Organization, or PTO, together.  Tr. 69.

Ms. Benoit's daughter and petitioner's son attended school together during the 2014-2015 school year.  Pet. Ex. 30 at ¶ 1; Tr. 69.  Ms. Benoit testified that petitioner was never limited in her ability to volunteer at school events prior to the 2014-2015 school year.  Tr. 71.

In Fall 2014, Ms. Benoit and petitioner volunteered at various school events together. Pet. Ex. 30 at ¶ 2.  They volunteered weekly at the school store from September through December 2014.  Id. at ¶ 5; Tr. 69-70.  Their duties included setting up and tearing down a table, lifting boxes of supplies and items for the children to buy, setting up supplies on the table, purchasing supplies, counting money, and more.  Pet. Ex. 30 at ¶ 5; Tr. 70.  Ms. Benoit averred that petitioner was able to help set up the school store at the beginning of the 2014 school year, but beginning in mid-October 2014, she "was no longer able to assist with lifting boxes and setting up the table for the school store due to her shoulder pain."  Pet. Ex. 30 at ¶ 6; see also Tr. 71-73.  Ms. Benoit testified that petitioner told her that she could not help lift boxes and set up tables like she used to because "her arm was bothering her" and "[s]he could not lift" the boxes and table.  Tr. 72.

On October 24, 2014, they volunteered at the school's "Boo Bash."  Pet. Ex. 30 at ¶ 3;
Tr. 74.  The parent volunteers assisted with selling tickets, organizing games, selling food,
decorating, and setting up and tearing down tables.  Tr. 74-75.  Ms. Benoit explained that
petitioner was unable to help hang decorations from the ceiling.  Pet. Ex. 30 at ¶ 3; Tr. 75-76.
She averred that petitioner told her "she had pain in her shoulder and she could not lift her arm
over her head."  Pet. Ex. 30 at ¶ 3; see also Tr. 75-76.

There was a holiday event in the school cafeteria on December 5, 2014 with raffles and a
Secret Santa.  Pet. Ex. 30 at ¶ 4; Tr. 77.  Ms. Benoit testified that the parent volunteers helped set
up tables, wrap baskets, carry baskets to the cafeteria, and more.  Tr. 77.  The baskets were large
and heavy.  Tr. 78.  She averred that petitioner could not lift the baskets "due to her shoulder
pain."  Pet. Ex. 30 at ¶ 4; see also Tr. 77-78.

Ms. Benoit and petitioner also volunteered at the Candy Bar Bingo in January 2015.  Tr.
78-79.  The parent volunteers helped set up tables and sell food and drinks.  Id.  Ms. Benoit did
not recall whether petitioner was limited in her ability to volunteer.  Tr. 79.

In March 2015, the school has a Scholastic Book Fair event.  Tr. 79.  The tasks for the
parent volunteers included organizing books in a bookcase, carrying boxes of books, setting up
tables, and more.  Tr. 80.  Ms. Benoit testified that petitioner "could not lift her arms up and put
the books [] on top of the bookcases" or help lift the boxes with books.  Id.

Petitioner told Ms. Benoit that she was having "pain in her left shoulder and her arm and
a burning sensation," which "was getting worse where she couldn't even lift her arm up over her
head or sleep on that side."  Tr. 80-81.  Ms. Benoit recalled petitioner "stated that her shoulder
pain began after she received a flu shot."  Pet. Ex. 30 at ¶ 6.

On cross-examination, Ms. Benoit testified that during the Fall of 2014, she saw
petitioner on a weekly basis and was not aware of any other health problems petitioner had other
than heart problems when petitioner was younger.  Tr. 84.  Petitioner did not complain about
back, hip, or foot pain to Ms. Benoit during this time.  Id.  In the Spring of 2015, Ms. Benoit
continued to see petitioner on a weekly basis at the school store and testified that petitioner
continued to have difficulties during that time.  Tr. 84-85.

### 3.       Affidavit of Christine Heydon

Christine Heydon, petitioner's mother, provided an affidavit in support of petitioner's
claim.  Pet. Ex. 32.  She averred that prior to petitioner's flu vaccination, she never complained
about left shoulder pain.  Id. at ¶ 9.

Ms. Heydon stated that in October 2014, one week after petitioner's flu vaccination,
petitioner called her complaining of "a lot of pain in her left shoulder where she had received the
shot."  Pet. Ex. 32 at ¶ 4.  Ms. Heydon suggested petitioner ice and rest her shoulder, and avoid
using her left arm.  Id. at ¶ 5.

During the following months, petitioner "repeatedly told [Ms. Heydon] the pain in her shoulder was not going away" and "her range of motion in her left arm was limited." Pet. Ex. 32 at ¶ 5.  Petitioner complained of "aches, inability to lift her arm, and stiffness."  Id. at ¶ 6.  She was having difficulty driving, getting in and out of the car, getting dressed and undressed, and going to the bathroom alone.  Id. at ¶ 7.  Additionally, petitioner could no longer do Pilates and yoga, or help unpack books at her son's school's bookstore because of her shoulder pain.  Id. at ¶¶ 9-10.  Ms. Heydon added that petitioner thought she slept on her arm wrong for some time because "[s]he wasn't sure what caused her so much shoulder pain."  Id. at ¶ 8.

Ms. Heydon explained that petitioner "is not a complainer . . . so for [petitioner] to actually call [her] and complain about pain means that it's bad."  Pet. Ex. 32 at ¶ 6.  Petitioner rarely complained to Ms. Heydon about her EDS.  Id.

## III.    PARTIES' ARGUMENTS

Petitioner argued the onset of her left shoulder pain occurred within 24 hours of her flu vaccination.  Pet. Br. at 1.  Petitioner asserted that despite an eight-month delay in seeking treatment, the medical records indicate petitioner's onset is correlated with the administration of her flu vaccine, which is further substantiated by the affidavits submitted in support of her claim.  Id. at 14-15.  Although petitioner visited various providers in the months following her flu shot before seeking treatment for her left shoulder, petitioner emphasized that she "was not reporting concurrent pain issues to specialists she was seeking for her other chronic issues" and "[a]s such, these visits cannot be dispositive of injury onset."  Id. at 15-16.

Petitioner cited Tenneson v. Secretary of Health & Human Services, where the undersigned determined the affidavits and medical records provided preponderant evidence of a 48-hour onset, despite a five-month delay in seeking treatment.  No. 16-1664V, 2018 WL 3083140, at *5-6 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), mot. for rev. denied, 142 Fed. Cl. 329 (2019).  Petitioner argued her evidence "is at least as strong as the evidence in Tenneson."  Pet. Br. at 17.  Like Tenneson, petitioner asserts that she delayed seeking treatment, but that her affidavits work "in tandem" with the medical records to provide preponderant evidence of onset.  Id. at 17-18.

Respondent argued the clear and consistent contemporaneous medical records establish that petitioner's left shoulder pain began in April 2015, and there is no reliable, objective evidence supporting an onset within 48 hours of vaccination.  Resp. Br. at 9, 13.  Respondent maintained that the affidavits conflict with the contemporaneous medical records, and thus, the affidavits should be afforded little weight.  Id. at 12.  Respondent added that petitioner did not seek treatment for her left shoulder until June 2015, eight months after vaccination, despite seeking treatment for other ailments during this time.  Id. at 9.  Respondent conceded that it "may not be entirely unreasonable" for petitioner to not mention her shoulder pain at her visit with her endocrinologist or at her visit to urgent care for bronchitis.  Id. at 10.  However, respondent argued that petitioner likely would have mentioned she was suffering from shoulder pain after vaccination at her visit to her primary care physician in February 2015, "or, at minimum, scheduled another visit within the first few months after the alleged onset of her shoulder pain."  Id.

## IV.    DISCUSSION

### A.    Applicable Legal Standard

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 11(c)(2).  The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (noting it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems).  Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993); Doe/70 v. Sec'y of Health & Hum. Servs., 95 Fed. Cl. 598, 608 (2010) ("Given the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law."); Rickett v. Sec'y of Health & Hum. Servs., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion).  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions.  Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, 809 F. App'x 843 (Fed. Cir. 2020); Cucuras v. Sec'y of Health & Hum. Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence.  Cucuras, 993 F.2d at 1528; see also Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight." (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1947))), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or

inaccurate.  Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733)).  Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded.  Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## B.      Evaluation of the Evidence

The undersigned finds that there is preponderant evidence that the onset of petitioner's left shoulder pain occurred in April 2015, approximately six months after her October 3, 2014 flu vaccination.  There are several reasons for this finding.  First, contemporaneous medical records by three independent health care providers document that the onset of petitioner's shoulder pain began in April 2015.

The first medical record noting petitioner's left shoulder pain is from a June 11, 2015 visit to Dr. Favreau, where petitioner complained of limited range of motion in her left shoulder for two months.  Pet. Ex. 11 at 11.  This places onset in April 2015.  On June 16, 2015, petitioner saw orthopedist, Dr. Green, for left shoulder pain that was "present for about two months."  Pet. Ex. 10 at 8.  Again, this places onset in April 2015.  At petitioner's initial PT evaluation for her left shoulder pain on June 18, 2015, her onset was noted as two months earlier.  Pet. Ex. 14 at 2.  Again, this puts onset in April 2015.  Thus, in the period of one month, three different health care providers (at three different locations) took a history from the petitioner, and all of them placed the onset of petitioner's shoulder pain in April 2015.

Medical records generally "warrant consideration as trustworthy evidence."  Cucuras, 993 F.2d at 1528.  However, greater weight is typically given to contemporaneous records. Vergara v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony.").  The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  Cucuras, 993 F.2d at 1528.  Here, the earlier-in-time records consistently place the onset of petitioner's left shoulder pain in April 2015.  The fact that the records were documented by different health care providers adds reliability to this finding.

The second basis for the undersigned's finding is that petitioner saw her chiropractor, Dr. Caliri, from August through December 2014, but his records during this time frame do not document petitioner's shoulder pain.  While it is perhaps reasonable that petitioner would not report shoulder pain to her cardiologist or endocrinologist, it is difficult to understand why she would not have reported shoulder pain to her chiropractor.  Her chiropractor was treating petitioner's back and hip joint pain, as well as leg pain.  Chiropractors routinely treat joint pain.

Thus, it is difficult to understand why petitioner would not have reported her shoulder pain to her chiropractor if it had been present when she saw him in October (eight visits), November (four visits), and December (two visits) of 2014.

The third reason for the undersigned's finding is that later records are less specific as to onset. An MRI conducted on October 22, 2015, more than one year after vaccination, and four months after petitioner began seeking treatment for her shoulder, indicated petitioner had "[l]eft shoulder pain radiating to the arm for one year." Pet. Ex. 7 at 24. This would place onset in later October 2014. Dr. Green, on December 1, 2015, noted petitioner had left shoulder pain "for greater than one year." Pet. Ex. 10 at 1. And on January 20, 2016, at a PT initial evaluation, petitioner reported "chronic [left] shoulder pain since 12/2014." Pet. Ex. 21 at 20. These two notes place onset in December 2014. These records place onset sometime between October and December 2014, inconsistent with the earlier-in-time, contemporaneous records. With the passage of time, patients may have difficulty recalling the exact time frame of events, such as onset. Petitioner's records documenting events that occurred approximately one year later illustrate the lack of specificity that may occur when recalling past events, and thus, the records are less reliable.

The last, but perhaps most important, reason is that petitioner did not relate the onset of her pain to her flu shot until approximately one-and-one-half years after her vaccination. On April 13, 2016, Dr. Brecher wrote, "[petitioner] developed shoulder pain after a flu shot one year ago. She thinks she may have had [too] high an injection." Pet. Ex. 3 at 5. This is the first time the records document that petitioner attributed her shoulder pain to her flu shot.

Petitioner saw Dr. Favreau on April 20, 2016, and again she questioned whether her shoulder pain was related to her flu vaccination. Pet. Ex. 11 at 1. On February 3, 2017, petitioner visited Dr. Conte, who documented that two years prior, petitioner "received a flu shot to left deltoid. Since then has had difficulty with full active [range of motion] of the shoulder. Was quite painful as well." Pet. Ex. 16 at 11. These later-in-time records are less reliable because they were more than one-and-one-half years after vaccination and after petitioner contacted an attorney to pursue a vaccine injury claim. In the undersigned's experience, petitioners with shoulder injuries may delay in seeking health care for their pain, but when they first seek treatment, they consistently relate the onset of the pain back to their vaccination or to the time frame within which the vaccination was administered. That is not the factual scenario here.

Although the undersigned has previously found that a delay in seeking treatment for a shoulder injury does not necessarily defeat a SIRVA claim, the facts and circumstances of those cases are different. For example, in Forman-Franco v. Secretary of Health & Human Services, petitioner did not initially complain to her treating doctors of left shoulder pain following her flu vaccination. No. 15-1479V, 2018 WL 1835203, *4 (Fed. Cl. Spec. Mstr. Feb. 21, 2018). However, when the petitioner in Forman-Franco did seek treatment for her shoulder pain, she related the onset of her pain to the time frame of her vaccination. Id. Similarly, the petitioner in Tenneson related onset of her left shoulder pain back to the time frame of her vaccination once she sought treatment after an initial delay of six months. 2018 WL 3083140, at *5. Unlike the

petitioners in <u>Forman-Franco</u> and <u>Tenneson</u>, petitioner here first related the onset of her shoulder pain to April 2015.

Petitioner's affidavit and testimony are inconsistent with her contemporaneous medical records, which calls into question whether petitioner accurately remembers the chronology of events relative to her shoulder pain. Petitioner's affidavit and testimony, Ms. Benoit's affidavit and testimony, as well as Ms. Heydon's affidavit, place petitioner's onset in October 2014. However, the affidavits and testimonies contradict petitioner's contemporaneous medical records, which place onset in April 2015.

Because petitioner's affidavit and testimony are inconsistent with and contradicted by the contemporaneous medical records, it is reasonable to give greater weight to the contemporaneous medical records. <u>See</u> <u>Cucuras</u>, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); <u>Doe/70</u>, 95 Fed. Cl. at 608; <u>Stevens v. Sec'y of Health & Hum. Servs.</u>, No. 90-221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990) (noting that "clear, cogent, and consistent testimony can overcome such missing or contradictory medical records"); <u>Vergara</u>, 2014 WL 2795491, at *4 ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."). This finding also extends to the lay witness affidavits and testimony. Other special masters have been faced with similar situations and found the contemporaneous medical records more persuasive than the affidavits and testimonies of lay witnesses. <u>See, e.g.</u>, <u>Rote v. Sec'y of Health & Hum. Servs.</u>, No. 90-036V, 1992 WL 165970, *5 (Cl. Ct. Spec. Mstr. July 1, 1992) (finding the lay witness testimony insufficient to overcome the weight of the contemporaneous medical records); <u>Bergman v. Sec'y of Health & Hum. Servs.</u>, No. 90-1252V, 1992 WL 78671, *4 (Cl. Ct. Spec. Mstr. Mar. 31, 1992) (same); <u>Daiza v. Sec'y of Health & Hum. Servs.</u>, No. 90-1188V, 1992 WL 59709, *4 (Cl. Ct. Spec. Mstr. Mar. 5, 1992) (same).

## V.    CONCLUSION

For all the foregoing reasons, the undersigned finds, based on the record as a whole, that there is preponderant evidence that the onset of symptoms began in April 2015, six months after she received her flu vaccination in October 2014.

The petitioner shall review this Ruling and file a status report, advising the undersigned as to how she wishes to proceed, **within 30 days, by Monday, February 8, 2021**. Petitioner may elect to dismiss her petition or proceed with her claim. If she chooses to dismiss her petition, she should review the Court's guidelines and reference the guidelines on exiting the program.

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master